IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 3, 2003 Session


HONNIE GUNNOE, ET AL. v. GERALD LEE LAMBERT, ET AL.
v. L.D. SIMERLY, ET AL.


Appeal from the Chancery Court for Carter County
No. 25461     G. Richard Johnson, Chancellor


FIELD FEBRUARY 13, 2004


No. E2003-01283-COA-R3-CV

---

Honnie Gunnoe and Virginia Ott Gunnoe ("Plaintiffs") sued their neighbors, Gerald Lee Lambert and Janice Lee Lambert ("the Lamberts") and L.D. Simerly and Geraldine Simerly ("the Simerlys") seeking, among other things, to quiet title to a parcel of land. After a bench trial, the Trial Court found, *inter alia*, that Plaintiffs did not own the land in question. Plaintiffs appeal. We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;
Case Remanded**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.


Kathryn J. Dugger-Edwards, Elizabethton, Tennessee, for the Appellants, Honnie Gunnoe and wife, Virginia Ott Gunnoe.

Thomas C. Jessee, Johnson City, Tennessee, for the Appellees, L.D. Simerly and wife, Geraldine Simerly.

William J. Byrd, Elizabethton, Tennessee, for the Appellees, Gerald Lee Lambert and wife, Janice Lee Lambert.

# OPINION

## Background

The parties involved in this case own land at Watauga Lake in Carter County, Tennessee. Plaintiffs sued the Simerlys and the Lamberts, claiming, among other things, that a recorded docking rights deed from the Simerlys to the Lamberts placed a cloud on Plaintiffs' title and that the Lamberts' dock encroached on Plaintiffs' land. Plaintiffs sought, among other things, to quiet title and asked for damages for slander of title and nuisance. Plaintiffs also claimed that a 1965 lawsuit between Plaintiffs and the Simerlys' predecessors in title, Richard Lee Hughes and his wife, Minnie Belle Hughes ("the Hughes"), was res judicata and binding on the Simerlys and the Lamberts. The Simerlys and the Lamberts answered the complaint. The Lamberts also filed a counterclaim against Plaintiffs and a crossclaim against the Simerlys requesting indemnification or damages should the Lamberts be found liable to Plaintiffs.

The case proceeded to a bench trial. At the conclusion of Plaintiffs' proof, the Simerlys and the Lamberts moved for a directed verdict[1] as to Plaintiffs' claims of nuisance and slander of title. Plaintiffs agreed they had not proven nuisance and that claim was dismissed. The Trial Court also granted a dismissal of the claim for slander of title. The Trial Court later entered an order stating that "[a]fter carefully considering the plaintiffs' proof in a light most favorable to the plaintiffs, construing all questions in their favor, the Court found that the motion for directed verdict by the defendants as it relates to the plaintiffs' claim of slander of title was well taken . . . ." The trial then proceeded on the claim to quiet title.

It was established at trial that Plaintiffs purchased their property in 1958 and had a survey done at that time. Plaintiffs' property is bordered generally on the west and south by National Forest land and on the north by the Lamberts' property. The area in question in this case is the strip of land that borders Watauga Lake on the east side of Plaintiffs' property. Both Plaintiffs and the Simerlys claim ownership of this strip of land, which is below the 1980 elevation line.

In 1965, Plaintiffs had a boat dock in the water. The Hughes, the Simerlys' predecessors in title, sued Plaintiffs requesting a mandatory injunction to require Plaintiffs to move the boat dock the Hughes claimed was on their property. This dock was located between the 1940 and the 1959 elevation lines. The Hughes claimed to own the land below the 1980 elevation line. In their answer, Plaintiffs contested that the dock was on land owned by the Hughes "with the exception of when the waters of the Watauga Lake Reservoir receded, and then only approximately 5 feet of said dock extended beyond the property line of [Plaintiffs] and upon the property [the Hughes] aver belongs to them." An Order of Dismissal was entered in 1966 voluntarily dismissing the case with full prejudice. There are no findings of fact or conclusions of law in the 1966 Order of Dismissal.

---

[1] As it was a bench trial and not a jury trial, it should have been a motion for a Rule 41.02 involuntary dismissal.

As a result of the 1965 lawsuit, Plaintiffs had another survey done. Plaintiff Honnie Gunnoe stated that this second survey had "the same boundary lines and the same markings and everything that the first one did." Mr. Gunnoe claims that Mr. Hughes approached him with an offer to sell the property in question to the Gunnoes, but that Mr. Gunnoe replied that he already owned the land. Mr. Gunnoe also claims that shortly after the 1965 lawsuit was dismissed, the dock at issue in that case was stolen.

Some time during the 1960's, Mr. Gunnoe had a conversation regarding the land in question with another neighbor, Patricia Kadar. Ms. Kadar has known Plaintiffs since she was seventeen years old and she and her husband have owned property at Watauga Lake near the Plaintiffs' land since 1954. Ms. Kadar stated that she and her husband had tried for some time to buy their lake frontage from the Hughes but were refused. Then in 1966, the Kadars got a letter from the Hughes offering to sell them their lake frontage. The Kadars purchased their lake frontage. Ms. Kadar stated that she and her husband spoke to Plaintiffs and asked Plaintiffs if they were going to buy their water front. Ms. Kadar testified Mr. Gunnoe replied "No, I'm not going to buy it because there's nothing he can do with it, so why should I buy it." Mr. Gunnoe admits that he had a conversation with Ms. Kadar, but claims he told her he would not buy the land because he already owned it.

In 1995, Mr. Simerly and Mr. Lambert signed and recorded an agreement regarding lake access and docking rights. This agreement allowed the Lamberts to place a dock on the land in question. Mr. Gunnoe claims he gave Mr. Lambert verbal permission to put in the boat dock. However, Mr. Gunnoe claims Mr. Lambert did other work without consulting Plaintiffs and specifically "didn't tell me that he was going to put a road into it, he didn't tell me he was going to put concrete there where the spring was at."

In 2000, Plaintiffs decided to sell their land and hired a realtor. The real estate agent hired a licensed surveyor, Ricky Lynn Snyder, to survey the property. The Snyder survey showed that Plaintiffs did not own the land in question. Unhappy with Snyder's survey, Plaintiffs then hired another licensed surveyor, Steve Pierce, and had another survey done. The Pierce survey showed that Plaintiffs did own the land in question. Plaintiffs also hired another real estate agent. Both Mr. Snyder and Mr. Pierce testified at trial regarding their surveys and these two surveys were admitted into evidence.

In August of 2001, Plaintiffs signed a contract to sell their property for $165,000 to Todd Tomlinson and his wife, Patty Tomlinson. The sales agreement contained a condition that "any errors in survey or disputes with adjoining owners will have to be settled to buyers satisfaction at sellers expense." The contract expired before Plaintiffs were able to satisfy the dispute with the Simerlys regarding the land in question and Plaintiffs apparently lost this sale.

In September of 2001, after claiming to discover that the Simerlys were asserting ownership of the disputed land, Mr. Gunnoe went to the Simerlys' house to talk about the situation. Mr. Gunnoe claims that he told the Simerlys that he had won the 1965 lawsuit against the Hughes

and that Plaintiffs owned the land. Mr. Gunnoe claims Mr. Simerly disputed this, but that Mrs. Simerly told her husband "that probably he should keep his mouth shut until he found out for sure." Mr. Gunnoe claims he then asked Mr. Simerly what he thought the property was worth and Mr. Simerly replied "$100,000.00." Mr. Gunnoe responded to this figure by saying "Okay, we'll find out what I can find out with it then." Plaintiffs consulted with an attorney that same day. Mr. Simerly also testified about this conversation with Mr. Gunnoe. Mr. Simerly claims that Mr. Gunnoe came to his house one day and asked what the Simerlys would take for the property in question. Mr. Simerly claims Plaintiffs wanted to buy the property, but did not make an offer.

In pertinent part, the description of Plaintiffs' property as contained in Plaintiffs' deed states:

> Situate in the 1st Civil District of Carter County, Tennessee, and more particularly described as follows:
>
> Beginning on a stake in a mound of stone and being southeast corner to the property of Ralph York and wife Ruth York; thence in a southeast direction along the high water line of the Watauga Lake a distance of approximately 775 ft. to a stake in the line of the U.S. Forest boundry (sic) line; thence with the line of the U.S. Forest line four calls: N. 80 deg. W. 300 feet to an 18" Oak; thence N. 34 deg. W. 180 ft. to a fence angle; thence N. 39 deg. W. 140 ft. to a fence angle; thence N. 27 deg. W. 380 ft. to an Iron Pin, corner to Ralph and Ruth York; thence with the line of same East 240 ft. to the Beginning, containing 3.5 acres more or less. . . .

The deed also contains a flowage easement which allows the Tennessee Valley Authority ("TVA") to flood the property in question up to the 1980 elevation line.

When preparing his survey, Mr. Snyder was unable to locate the point of beginning in Plaintiffs' deed, which is described as being "on a stake in a mound of stone being the southeast corner of the property of Ralph York and wife Ruth York." However, he used Plaintiffs' deed and found several other monuments including U.S. Forest Service monuments "on the back lines and on the south line." He used a TVA bench mark located in front of the Simerlys' house to locate the 1980 line and verify the elevations. He found TVA designations of the 1980 line including white painted marks on trees and a "fiberglass sign post in the hollow area that's marked flowage easement." Mr. Snyder also found an iron pin marking the common corner between Plaintiffs' land and the Forest Service land. In addition, he located a nail that he had set when he surveyed the Lambert property in March of 2000, marking the northeast corner of Plaintiffs' property.

Mr. Snyder was questioned regarding why although Plaintiffs' deed calls for 240 feet from the Forest Service line the survey prepared by Mr. Snyder did not give 240 feet. Mr. Snyder stated "I believe the intention of the parties was the high water line and I believe distances are secondary to that." Mr. Snyder also testified that on the south-side boundary line he did not give Plaintiffs the 300 feet that their deed calls for.

-4-

Mr. Pierce followed Plaintiffs' deed and the prior surveys when preparing his survey. He explained that Plaintiffs' property is bordered on the west side by U.S. Forest Service land and that on the southerly side was an old fence and on the northerly side was a spring. Mr. Pierce was unable to locate the spring. He claims Mr. Gunnoe told him that the spring was now covered by concrete. Mr. Pierce located the Forest Service line to the east, the eighteen inch oak tree, and the remnants of the old fence. Like Mr. Snyder, Mr. Pierce was unable to locate the "stake in a mound of stone . . . being the southwest corner to property of Ralph York . . . ." He claimed this monument "had been obliterated because it was down in the water." Since he could not locate this monument, he "came 240 feet from this Forest Service corner in an easterly direction," and replaced the stake used by a prior surveyor. Mr. Pierce then located the eighteen inch oak tree marking the easterly corner and went 300 feet down towards the lake, like a prior surveyor had done. He was unable to locate any old stakes at that point, so he placed one. Mr. Pierce was unable to locate any TVA elevation markers to establish the location of the 1980 elevation line. He located the 1980 line by following a line approximately fifteen or twenty feet below a "line to the east of this driveway to Mr. Gunnoe's house." When he surveyed the property on the lake side, he didn't find any monuments so he "used the deed and the calls off of the deed. And [tried] to look at these things like the old surveyor did and [tried] to follow the footsteps of the fellow that came before me that did it first." Mr. Pierce placed the boundary line in question below the 1980 elevation. He stated that at the south end the boundary line is "approximately eighty-five feet" below the 1980 elevation and at the north end, "it's twenty-one feet" below the 1980 line.

The call in Plaintiffs' deed stating "thence in a southeast direction along the high water line of the Watauga Lake a distance of approximately 775 ft. to a stake in the line of the U.S. Forest boundry (sic) line; . . ." is a key point of disagreement between the Pierce survey and the Snyder survey. Mr. Pierce explained that "the 1980 elevation contour line is the flowage easement for the Watauga area reservoir. That is the point that the water would go over the top of the dam if it ever got that high." However, Mr. Pierce does not believe that the high water mark mentioned in Plaintiffs' deed is the same as the 1980 elevation line. Instead, Mr. Pierce located "the high water mark, which is approximately elevation of 1968, which is the highest the water has ever got in Watauga Lake . . . ." In contrast, Mr. Snyder assumed that the high water line called for in Plaintiffs' deed means the 1980 elevation line. Mr. Snyder testified he knows of no other elevation generally accepted by surveyors as the high water line of Watauga Lake other than the 1980 elevation line, but he admitted that it was possible the parties intended to convey the land just to the edge of the water where it was in 1958. In part, Mr. Snyder bases his theory upon the fact that he did locate the stake in the line of the U.S. Forest boundary line as called for in the deed, and did not find any stakes in the Forest Service boundary below the 1980 elevation line. Mr. Snyder also was questioned about the fact that there are no degrees listed in Plaintiffs' deed telling which direction to go in the southeast to determine the boundary in question. Mr. Snyder believes this is because that line meanders as it follows the 1980 high water line. The rest of the calls in Plaintiffs' deed have degrees when they call for straight lines.

Mr. Snyder explained the difference between his survey and the Pierce survey stating: "[t]he difference is because my line reflects the high water line as it exists on the ground. The line

as surveyed by Mr. Pierce reflects the deed distances from the back line of the Forest Service downward toward the lake." In addition, Mr. Snyder checked the elevations of the northeast point and the southeast point on the Pierce survey and discovered that the elevation at the northeast corner was 1982 and at the southeast corner was 1941.9. If correct, this would result in the water level dropping approximately forty feet at an angle along a distance of approximately 775 feet. Mr. Snyder stated that Watauga lake is a ponded surface and water would not behave in that manner on a ponded surface.

Mr. Pierce criticized the Snyder survey stating "[Mr. Snyder] should have went the platted distances recorded in Mr. Gunnoe's deed and on the original plat by the original surveyor he should have went 300 feet to the south and he should have went 240 feet to the north, just like the plat and the deed calls for."

The Trial Court issued an opinion from the bench and entered an order on May 12, 2003, incorporating that opinion.[2] In its opinion issued from the bench, the Trial Court found that the Snyder survey "follows very closely the description in the Plaintiff's deed, with Mr. Snyder recognizing the natural and artificial objects." The Trial Court also found that as between the Snyder survey and the Pierce survey, the Snyder survey more accurately reflected "the true eastern boundary of Plaintiff's with Defendant Simerly" per the deed and all of the other information presented at trial. In the May 12th order, the Trial Court stated:

> Based on the testimony of the witnesses and their demeanor, the Court finds that the Snyder survey accurately reflects the location of the Gunnoe property thereby establishing that the dock constructed by Lambert is on property owned by the Simerlys. As noted in the attached opinion rendered on the day of trial, the Court finds that the critical witness, Patricia Kadar, clearly established that the plaintiffs knew that the property in question was owned by the Simerlys.

In the opinion issued from the bench, the Trial Court referred to Ms. Kadar's testimony as "the smoking gun." The Trial Court found that the property in question was owned by the Simerlys and dismissed Plaintiffs' complaint. The Lamberts' counterclaim and crossclaim also were dismissed. Plaintiffs appeal to this Court.

## Discussion

Plaintiffs raise three issues on appeal: 1) whether the Trial Court erred in failing to apply the doctrine of collateral estoppel; 2) whether the Trial Court erred in concluding that the property in question does not belong to the Plaintiffs; and 3) whether the Trial Court erred in granting a directed verdict dismissing the action for slander of title. We will address the issues in turn.

---

[2]When issuing its opinion from the bench, the Trial Court mistakenly referred to the Lamberts as the owners of the property in question instead of the Simerlys. The Trial Court corrected this mistake in its May 12, 2003 order.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We will first consider whether the Trial Court erred in failing to apply the doctrine of collateral estoppel. Our Supreme Court has discussed res judicata and collateral estoppel stating:

> The term "res judicata" is defined as a "[r]ule that a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action . . . . [T]o be applicable, it requires identity of cause of action, or person and parties to action, and of quality in persons for or against whom claim is made." Black's Law Dictionary 1172 (5th ed. 1979)(citations omitted). We have recently discussed the doctrine and its related counterpart, collateral estoppel, as follows:
>
>> The doctrine of res judicata bars a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit.
>
> *Goeke v. Woods, 777 S.W.2d 347, 349 (Tenn. 1989)*(quoting from *Massengill v. Scott, 738 S.W.2d 629, 631 (Tenn. 1987))*. Res judicata and collateral estoppel apply only if the prior judgment concludes the rights of the parties on the merits. *A. L. Kornman Co. v. Metropolitan Gov't of Nashville & Davidson County, 216 Tenn. 205, 391 S.W.2d 633, 636 (1965)*. One defending on the basis of res judicata or collateral estoppel must demonstrate that 1) the judgment in the prior case was final and concluded the rights of the party against whom the defense is asserted, and 2) both cases involve the same parties, the same cause of action, or identical issues. *Scales v. Scales, 564 S.W.2d 667, 670 (Tenn. App. 1977),* cert. denied, (Tenn. 1978).

*Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 459 (Tenn. 1995). "The doctrine [of collateral estoppel] does not apply unless the determination of the issue in the prior suit was necessary to the decision." *Dickerson v. Godfrey*, 825 S.W.2d 692, 695 (Tenn. 1992).

The Trial Court properly refused to apply the doctrine of collateral estoppel in this case because the two cases in question, the current case and the 1965 action, do not involve the same cause of action or identical issues. The 1965 case was one seeking a mandatory injunction for removal of a boat dock. The boat dock at issue in that case does not even exist anymore, but rather,

according to Plaintiffs, was stolen shortly after the conclusion of that case. The case at hand involves an issue of a boundary dispute, a different cause of action with different issues.

In addition, the 1965 case was voluntarily dismissed with full prejudice, not litigated. The order dismissing the case contains no findings of fact or conclusions of law. "Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined in the former suit." *Id*. (quoting *Goeke v. Woods,* 777 S.W.2d at 349). The issues in the 1965 case were not actually litigated and determined. Based upon the evidence contained in the record before us pertaining to the 1965 lawsuit, we cannot hold that the issue of title to the property at question in this lawsuit was an issue adjudicated in the 1965 lawsuit. Likewise, we cannot say that the issue as to title of the property in question in this lawsuit was actually decided or is one that must have been decided in the outcome of the 1965 case. Therefore, collateral estoppel will not apply. We hold that the Trial Court correctly refused to apply collateral estoppel.

We next consider whether the Trial Court erred in concluding that the property in question does not belong to the Plaintiffs. "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998)).

In *Thornburg v. Chase*, this Court set forth the framework a court should use when dealing with a boundary dispute as follows:

> In determining disputed boundaries, resort is to be had first to natural objects or landmarks, because of their very permanent character; next, to artificial monuments or marks, then to the boundary lines of adjacent landowners, and then to courses and distances. *Pritchard v. Rebori, 135 Tenn. 328, 186 S.W.121 (1916); Minor v. Belk, 50 Tenn. App. 213, 360 S.W.2d 477 (1962); Doss v. Tenn. Prod. & Chem. Corp., 47 Tenn. App. 577, 340 S.W.2d 923 (1960).* This rule of construction is to aid in determining the intention of the parties to a deed which is to be determined, if possible, from the instrument in connection with the surrounding circumstances. *Dearing v. Brush Creek Coal Co., 182 Tenn. 302, 186 S.W.2d 329 (1945); Cates v. Reynolds, 143 Tenn. 667, 228 S.W. 695 (1920).*

*Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn. Ct. App. 1980).

The Trial Court utilized the correct framework and specifically stated in its opinion issued from the bench and incorporated by reference into the Trial Court's May 12, 2003, order:

> Tennessee also says that the Court in determining boundaries shall first consider natural objects. A natural object would be like a tree or other like natural

-8-

object, a rock facing, so on. Then to consider artificial monuments, posts that have been placed by people, things that have been placed by people. And then to consider the adjacent boundaries. As I mentioned we've got to look at the adjacent deeds. And last, the Court looks at courses and distances. Calls for courses and distances are considered last in the order of importance in establishing a boundary line between parties.

The Trial Court heard the testimony, examined the exhibits, and weighed the evidence using the correct framework when making its findings of fact. The Trial Court found that Mr. Snyder's survey recognized natural and artificial monuments that Mr. Pierce was unable to locate. The Trial Court also found that Mr. Snyder's survey "follows very closely the description in the Plaintiff's deed . . . ," and that "as between these surveys that the Snyder survey accurately per the deed and all of the other information that we have, accurately reflects the true eastern boundary of Plaintiff's with Defendant Simerly." We also find Mr. Snyder's testimony concerning the eastern boundary as reflected on the Pierce survey particularly telling. The eastern boundary on the Pierce survey is a straight line which does not follow any particular water line or level, but rather has an elevation at the northeast corner of 1982 and at the southeast corner of 1941.9 Either the Pierce survey's eastern boundary does not follow any one "high water line" as Plaintiffs' deed provides, or this ponded water somehow rests at a slant. In addition, the Trial Court found that Ms. Kadar's testimony showed that Plaintiffs knew they did not own the property in question. The Trial Court referred to Ms. Kadar's testimony as "the smoking gun." The evidence in the record does not preponderate against these findings.

We also note that our review of the trial transcript disclosed numerous times when witnesses in answering a question would point to something on the survey. Often there is nothing in the transcript or on the exhibit to show us in our review of the record exactly what the witness pointed to on the survey. The Trial Court, of course, had the benefit of seeing the witness indicate exactly what it was he was pointing to, while this Court does not. The evidence in the record does not preponderate against the Trial Court's findings leading to its conclusion that the property in question does not belong to Plaintiffs. We affirm on this issue.

Finally, we consider whether the Trial Court erred in granting a directed verdict dismissing the action for slander of title. Plaintiffs argue, in part, that a motion for a directed verdict was not proper and that the motion should have been one for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02(2). Plaintiffs are correct. This Court discussed the differences between a motion for directed verdict and one for an involuntary dismissal in *Smith v. Inman Realty Co.* stating:

Motions for directed verdicts pursuant to Tenn.R.Civ.P. 50 are appropriate in jury trials but have no place in nonjury trials. If a party desires to challenge the sufficiency of the plaintiff's proof in a nonjury trial, it must file a motion for involuntary dismissal at the close of the plaintiff's proof pursuant to Tenn.R.Civ.P. 41.02(2).

The respective standards of review of the trial court's disposition of these motions is markedly different. In the case of a motion for directed verdict, the trial court must take the strongest legitimate view of the evidence against the directed verdict and must deny the motion in any case where all reasonable persons would not reach the same conclusion. However, in the case of a motion for involuntary dismissal pursuant to Tenn.R.Civ.P. 41.02(2), the trial court must impartially weigh and evaluate the evidence as it would after the presentation of all the evidence and must deny the motion if the plaintiff has made out a prima facie case.

The manner in which the trial court reviews the evidence varies depending on the type of motion that has been filed. Motions for directed verdict require more certainty in the proof than do motions for involuntary dismissal pursuant to Tenn.R.Civ.P. 41.02(2).

*Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821 (Tenn. Ct. App. 1992) (citations omitted).

Defendants argue that "[a]lthough the court misstated the rule number, it is clear the court followed the appropriate procedure in making a ruling concerning the [Defendants'] motion for judgment." The Trial Court stated in its May 12, 2003, order that "[a]fter carefully considering the plaintiffs' proof in a light most favorable to the plaintiffs, construing all questions in their favor, the Court found that the motion for directed verdict by the defendants as it relates to the plaintiffs' claim of slander of title was well taken . . . ."

If Plaintiffs are correct, and they may well be, in their argument that the Trial Court improperly applied the Rule 50 standard rather that the Rule 41.02 standard which should have been applied, such an error would have been to Plaintiffs' benefit because Rule 50 motions require "more certainty in the proof than do motions for involuntary dismissal pursuant to Tenn.R.Civ.P. 41.02(2)." *Id.* Therefore, even if the Trial Court did improperly apply the Rule 50 standard rather than the Rule 41.02 standard, it was harmless error in this case.

In addition to holding that if the Trial Court improperly applied the Rule 50 standard, such error was harmless, we also note that we have affirmed the Trial Court's decision that the property in question does not belong to Plaintiffs. This being so, Plaintiffs did not and can not prove the necessary elements of their slander of title claim.

In order to prevail on a slander of title claim, a plaintiff must prove:

(1) that it has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss.

Statements made with reckless disregard of the property owner's rights or with reckless disregard as to whether the statements are false may be malicious within the scope of a libel of title action. To assert this cause of action, the plaintiff must allege "malice . . . in express terms or [by] any such showing of facts as would give rise to a reasonable inference that [the defendant acted maliciously.]" A good faith, but erroneous, claim of title does not constitute a cause of action for libel of title.

*Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999) (citations omitted).

A careful review of the record reveals that Plaintiffs failed to prove the elements of slander of title. Specifically, and as affirmed in this Opinion, Plaintiffs failed to prove they owned the property which made it impossible for Plaintiffs to prove the four elements of a slander of title claim. Plaintiffs failed to make a prima facie case with regard to their slander of title claim and the Trial Court correctly dismissed this claim.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the Appellants, Honnie Gunnoe and wife, Virginia Ott Gunnoe, and their surety.

_____
D. MICHAEL SWINEY, JUDGE